UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

James Cousino,

       Plaintiff,

       v.                         Civil Action No. 2:12-CV-258

Commissioner of Social Security,

       Defendant.

## OPINION AND ORDER
(Docs. 9, 12)

Plaintiff James Cousino brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting reversal of the decision of the Commissioner of Social

Security ("Commissioner") denying his application for disability insurance benefits.

Pending before the Court are Cousino's motion to reverse the Commissioner's decision

(Doc. 9), and the Commissioner's motion to affirm the same (Doc. 12).  For the reasons

stated below, the Court GRANTS Cousino's motion, in part; DENIES the

Commissioner's motion; and REMANDS for further proceedings and a new decision.

## Background

Cousino was thirty-nine years old on his alleged disability onset date of

July 3, 2009.  He was diagnosed with a learning disability in elementary school, and had

accommodations and an individualized education plan throughout his schooling.  (AR

300, 314.)  He graduated from high school in 1988, after attending a vocational training

program in human services.  (AR 48, 178, 300.)  Since then, he has held several jobs,

including as a grocery store clerk, a landscaper for his father's business, and a nurse's

aide at a nursing home.  (AR 52-54, 68-69, 186-90, 300.)  His most recent job was as a

seafood clerk at Hannaford's.  (AR 190.)  In 2008, he was terminated from that job due to

poor performance, after receiving several warnings related to his failure to properly clean

the seafood department.  (AR 253-55.)  His supervisor, Amanda Clark, noted in a Job

Screening Questionnaire that Cousino also had difficulty maintaining adequate hygiene.

(AR 253.)

Cousino has no children and has never married.  Although he is in his forties, he

has lived with his father and stepmother since 2008; they help him prepare meals, clean

his room, and do the laundry.  (AR 49-50, 65.)  His father and stepmother also help him

remember to take his medications and maintain personal hygiene, reminding him to

bathe, brush his teeth, and shave.  (AR 43-44, 62.)  In December 2010, Cousino's father,

Charles Cousino, stated in a letter that his son "really cannot perform activities of daily

living such as showering, changing clothes, brushing his teeth[,] etc., without supervision

and guidance."  (AR 286.)  In October 2011, Charles Cousino stated in another letter that

his son was unable to do household chores, and left the lights on and the water running at

their home.  (AR 122.)  Cousino's father and stepmother manage Cousino's finances, as

Cousino testified he cannot handle them on his own.  (AR 60.)

Cousino also testified that he does not drive and has never had a driver's license

because he is too nervous and would not be able to follow the rules of the road.  (AR 49,

63.)  He further testified that he has problems with anger, and difficulty following

directions and staying focused.  (AR 43-44.)  He stated that he can understand children's

books but not newspapers, and he needs help reading restaurant menus.  (AR 49.)  The

record reflects that Cousino's principal impairments are obstructive sleep apnea, a learning disability, anxiety disorder, and bipolar disorder.  Because of these impairments, Cousino alleges he has impaired memory and problems concentrating, paying attention, completing tasks, and understanding and following instructions.  (AR 224.)

In July 2010, noting that Cousino "has exhibited traits of [bipolar illness] from a very young age and has been unable to maintain steady relationships or employment" (AR 256), Cousino's primary care physician, Dr. Kevin Mulholland, referred Cousino to the Stern Center for "further psychiatric evaluation and treatment prior to pursuing employment" (AR 258).  On September 30, 2010, Lori Van Allen, a school psychologist for the Stern Center, conducted an extensive cognitive evaluation of Cousino, including IQ testing.  (AR 287-306.)  Among other things, the testing revealed a full scale IQ score of 80, described as "Low Average," and a perceptual reasoning score of 69, described as "Extremely Weak."  (AR 289.)  Although Van Allen stated that Cousino had "[l]apses in attention" during the evaluation, and thus "these scores may underestimate his skills and abilities slightly," she found that the scores were "an accurate reflection of [Cousino's] current skills and capabilities."  (*Id.*)  Van Allen concluded that Cousino's cognitive abilities were "low average," and that Cousino had a "nonverbal learning disability . . . characterized by very significant deficits in spatial organization, nonverbal reasoning, and visual motor integration."  (AR 300.)  The report continued:

> [Cousino has] [a]dditional weaknesses in auditory sequential processing, phonological processing, and phonological memory[, resulting] in significant learning disabilities in reading . . . and written expression . . . . These information processing weaknesses and academic deficits are long[-]standing and substantially limit his ability to read, write, or work at levels commensurate with his cognitive abilities or those of the general

3

population.  Thus, Mr. Cousino possesses significant disabilities as defined
by the ADA[,] and accommodations are warranted to mitigate the negative
impact of his processing weaknesses.

(AR 300-01.)

In April 2011, after conducting a mental examination of Cousino, psychologist Dr.
Shirley Oxidine diagnosed Cousino with Anxiety Disorder NOS, Learning Disorder
NOS, Attention-Deficit/Hyperactivity Disorder (Predominantly Inattentive Type), and
"R/O 317 Mild Mental Retardation," among other things.  (AR 310-11.)  She further
found that Cousino was "not capable of managing funds on his own behalf."  (AR 311.)
In July 2011, after conducting a mental examination of Cousino, psychologist Dr.
Benjamin Skolnik diagnosed Cousino with Learning Disorder NOS, and stated that
"[t]here is abundant evidence . . . that Mr. Cousino meets the criteria for a learning
disability not otherwise specified, most likely a non-verbal learning disability."  (AR
317.)  Dr. Skolnik further found, however, that Cousino "does not appear to have a global
intellectual impairment such as mental retardation," nor does he "appear at the present
time to meet criteria for an anxiety disorder as his difficulties with anxiety do not appear
to rise to the level of significant impact on his daily life."  (*Id.*)

In December 2010, Cousino filed an application for disability insurance benefits,
alleging that he has been unable to work due to a non-verbal learning disability, problems
with reading and writing, and anxiety disorder.  (AR 177.)  In May 2011, Cousino's
stepmother completed a Function Report in conjunction with Cousino's application,
wherein she stated that Cousino has extreme anxiety, severe sleep apnea, obesity,
difficulty maintaining adequate grooming and personal care, and inability to focus,

concentrate, follow instructions, and complete simple tasks.  (AR 211-16.)  She stated

that Cousino spends most of his days watching television, eating "junk food," and

sometimes engaging in social networking on the computer.  (AR 212.)

On February 23, 2012, Administrative Law Judge ("ALJ") Paul Martin conducted

a hearing on Cousino's application.  (AR 38-76.)  Cousino appeared and testified, and

was represented by counsel.  On March 30, 2012, the ALJ issued a decision finding that

Cousino was not disabled under the Social Security Act from July 3, 2009, his alleged

onset date, through the date of the decision.  (AR 13-33.)  Thereafter, the Appeals

Council denied Cousino's request for review, rendering the ALJ's decision the final

decision of the Commissioner.  (AR 1-3.)  Having exhausted his administrative remedies,

Cousino filed the Complaint in this action on November 26, 2012.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The

claimant is presumptively disabled if his or her impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that Cousino had not engaged in substantial gainful activity since his alleged disability onset date of July 3, 2009.  (AR 15.)  At step two, the ALJ found that Cousino had the following severe impairments: bipolar disorder, learning disability, anxiety disorder, and obstructive sleep apnea.  (*Id.*)  Conversely, the ALJ found that Cousino's gout, hypertension, gastroesophageal reflux disease, and pre-diabetes were not severe, given that "there is no substantial evidence in the record establishing significant treatment for

these conditions except for the fact that [Cousino] takes medications to control them."
(AR 16.)  At step three, after considering Listings 12.02, 12.04, 12.05, and 12.06, the
ALJ determined that none of Cousino's impairments, alone or in combination, met or
medically equaled a listed impairment.  (AR 16-20.)

Next, the ALJ determined that Cousino had the RFC to perform a full range of
work at all exertional levels but with the following nonexertional limitations:

> [Cousino] must avoid unprotected heights and regular work around
> dangerous machinery due to drowsiness caused by poor sleep associated
> with his sleep apnea.  [Cousino's] periodic and occasional drowsiness
> would be such that he would be prone to make careless mistakes.  For
> example, he might forget to . . . turn something [on or] off but it would not
> affect his balance particularly, or his ability to maintain his focus over a
> short period of time.  It might cause him to have some difficulty following
> the rules, meaning he could only follow short and simple workplace rules.
> He is limited to the performance of simple, repetitive and routine tasks,
> where the amount of reading he would have to do would be minimal.  For
> example, he may have to read basic instructions but not have to perform
> activities involving reading on a regular basis.  He requires an environment
> that is free of fast-paced production requirements, and free of requirements
> to multi-task.  [Cousino] can only perform work involving simple work-
> related decisions.   He can only adapt to routine workplace changes.
> [Cousino] can interact with supervisors on a routine basis, with no
> particular difficulty interacting with co-workers or the public as needed.

(AR 20.)  Given this RFC, the ALJ found that Cousino was unable to perform his past
relevant work as a cashier, a deli clerk, a seafood clerk, a landscape laborer, and a nurse's
aide.  (AR 31.)  Nonetheless, the ALJ determined that there were other jobs existing in
significant numbers in the national economy that Cousino could perform, including
warehouse worker/laborer, janitor/cleaner, fast-food worker, and chambermaid/hotel
housekeeper.  (AR 32-33.)  The ALJ concluded that Cousino had not been disabled from
his alleged onset date through the date of the decision.  (AR 33.)

**Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the

Social Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

Cousino's primary argument is that the ALJ erred in concluding that his mental

impairments did not meet or medically equal Listing 12.05C.  The Commissioner

disagrees, contending that the ALJ's decision is supported by substantial evidence and

complies with the applicable legal standards.

Listing 12.05, the listing for mental retardation, states as follows, in relevant part:

Mental retardation refers to *significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period*; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, *or* D are satisfied.

. . .

C. *A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function* . . . .

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05 (emphases added).  Therefore, for Cousino to

meet the requirements of Listing 12.05C, he must demonstrate that he has a valid verbal,

performance, or full scale IQ of 60 through 70; he has a physical or other mental

impairment imposing additional and significant work-related limitations of function; and

his mental impairment(s) manifested before the age of 22.  *Markle v. Barnhart*, 324 F.3d

182, 187 (3d Cir. 2003); *Bailey v. Apfel*, 230 F.3d 1063, 1065 (8th Cir. 2000).

The ALJ found that Cousino's mental impairments did not meet or medically equal Listing 12.05C for three principal reasons, each of which the Court finds are legally insufficient or not supported by substantial evidence.  First, the ALJ stated that, although Cousino had a perceptual reasoning score of 69, that score "only narrowly puts him into the category of a performance IQ below 70; and his full scale and verbal IQ scores were relatively high."  (AR 17.)  These factors—whether Cousino's performance IQ score only narrowly fell within the applicable range and whether his other two IQ scores were relatively high—are not relevant to the analysis, and the Commissioner cites no law to the contrary.  In fact, the Commissioner herself states in her motion that if Cousino's performance IQ score of 69 is "valid," "the Commissioner concedes [that] would satisfy [Cousino's] initial burden under listing 12.05" (Doc. 12-1 at 9), regardless of whether the score is "only narrowly" in the applicable range and despite there being two other scores that are "relatively high."[1]  Moreover, the regulations require that the ALJ consider the lowest IQ score for purposes of determining whether Listing 12.05 is met, stating as follows: "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, *we use the lowest of these in conjunction with 12.05*."  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(D)(6)(c) (emphasis added); *see Brown v. Sec'y of Health and Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991) ("The regulations require only that the

---

[1]  The lower of the other two IQ scores referenced in the ALJ's decision is Cousino's full-scale IQ score of 80.  (AR 17, 289.)  Although the ALJ described this score as "relatively high" (AR 17), it would be more accurate to describe it as relatively low.  Van Allen stated in the Stern Center report that this score indicated Cousino's cognitive abilities were "in the low average range" (AR 291); and consulting psychologist Dr. Skolnik stated in his report that this score "put[] [Cousino] in the low average to borderline range of functioning" (AR 314).

lowest I.Q. score be used in conjunction with Listing 12.05C.").  Therefore, the ALJ should have considered Cousino's lowest IQ score (69) at step three, unless he properly determined it was invalid.

In conjunction with his finding that Cousino's IQ score of 69 did not meet the requirements of Listing 12.05C, the ALJ inaccurately stated that the relevant category to meet Listing 12.05C was "below 70," when in fact it is "*through* 70," meaning up to and including 70.  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05C (emphasis added); *Markle*, 324 F.3d at 186 (claimant "would ordinarily satisfy the IQ guidelines for both § 12.05C and § 12.05D, given that he has a full scale IQ of 70") (quotation marks omitted).  The significance of this error is that Cousino's score of 69 is one point lower than the maximum score required to meet Listing 12.05C, rather than *at* the maximum, as the ALJ appears to have believed, i.e., slightly less "narrowly" within the applicable range.  The error is also noteworthy because, according to the Social Security Administration's Program Operations Manual System ("POMS"), "slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination."  POMS DI 24515.056(D)(1)(c), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/ 0424515056 (last visited Aug. 26, 2013).[2]

Thus, even if Cousino's lowest IQ score was higher than 70, he still may have met Listing 12.05 when his other disorders were considered.  But the ALJ appears to have

---

[2]  Although the POMS does not have the force and effect of law, it is persuasive authority and thus is entitled to be given weight.  *See St. Mary's Hosp. v. Blue Cross & Blue Shield*, 788 F.2d 888, 890 (2d Cir. 1986).

neglected to consider whether Cousino's combined mental limitations met or medically equaled Listing 12.05C.  Although he found that "[t]he severity of [Cousino's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, and 12.06" (AR 17), he did not make the same finding regarding Listing 12.05.  The ALJ should have considered whether the combined effect of Cousino's learning disability, bipolar disorder, anxiety disorder, and obstructive sleep apnea—all of which the ALJ found to be severe impairments (AR 15)—met or medically equaled Listing 12.05C.  *See, e.g.*, *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (combination of claimant's borderline intellectual functioning, psychiatric affective disorders, and physical disabilities found to be the medical equivalent of Listing 12.05C).

The ALJ's second justification for finding that Cousino's mental impairments did not meet or medically equal Listing 12.05C was that school psychologist Van Allen, who prepared the Stern Center report, "stated that her results may underestimate the claimant's abilities."  (AR 17.)  But the ALJ failed to discuss Van Allen's full statement, which provides more insight into the meaning of Cousino's test scores: "Lapses in attention were . . . apparent.  Thus, these scores may underestimate his skills and abilities slightly, but *they are felt to be an accurate reflection of his current skills and capabilities*."[3]  (AR 289 (emphasis added).)  A plain reading of this statement reveals that

---

[3]  Quoting this statement, the Commissioner states: "Admittedly, Ms. Van Allen's report appears contradictory in this regard.  She writes: '[Mr. Cousino's] scores may underestimate his skills and abilities slightly, but they are felt to be an accurate reflection of his current skills and capabilities.'"  (Doc. 12-1 at 11 (quoting AR 289).)  If the ALJ found these statements "insufficient or inconsistent," he should have "take[n] additional actions" to clarify the record, including re-contacting Van Allen, requesting additional records similar to those prepared by Van Allen, or asking Cousino for further information relevant to the inquiry.  20 C.F.R. § 404.1520b; *see Demera v. Astrue*, No. 12-CV-432 (FB), 2013 WL 391006, at *2 n.2 (E.D.N.Y. Jan. 24, 2013).

Van Allen believed Cousino's IQ scores accurately reflected his abilities, taking into account all his impairments including his lapses in attention.  Also indicative of this belief, Van Allen used unequivocal language to describe Cousino's performance, stating for example that Cousino had "extremely weak scores when replicating two-dimensional designs with colored cubes . . . and completing nonverbal analogies/patterns"; that these tasks were "<u>extremely</u> difficult for Mr. Cousino"; and that, "[c]learly, this type of reasoning was nearly impossible for him, placing his overall score for Perceptual Reasoning in the extremely deficient range."  (AR 290.)  Although the ALJ explicitly discussed much of Van Allen's evaluation, it is unclear if he considered these particular statements in the context of determining the validity of Cousino's performance IQ score of 69.  *See Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) (noting that 20 C.F.R. § 404.1545(a)(3) requires ALJs to consider "all of the relevant medical and other evidence").

The ALJ's third reason for finding that Cousino's mental impairments did not meet or medically equal Listing 12.05C was that Cousino "displayed a high level of intellectual functioning to me at the hearing in this case."  (*Id.*)  The Second Circuit has held that, although an ALJ may consider his own recorded observation of the claimant's physical demeanor at the hearing "as one of several factors in evaluating [the claimant's] credibility," *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) (citing 20 C.F.R. § 416.929(c)(3); *see also* SSR 96-97p, 1996 WL 362209 (July 2, 1996)), this observation is entitled to only "limited weight" because it is "that of a lay person," *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983).  Here, the ALJ placed too

heavy an emphasis on Cousino's physical appearance and conduct at the hearing,

mentioning it over five times in his decision (AR 17, 18, 19, 31), and using it as a

justification for finding Cousino's IQ score of 69 invalid (AR 17).  The Third Circuit has

held that this use of an ALJ's observations of a claimant at the hearing is impermissible,

stating: "'An ALJ cannot reject IQ scores based on personal observations of the claimant

and speculative inferences drawn from the record.'"  *Markle v. Barnhart*, 324 F.3d at 187

(quoting *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000)).  This is especially true

where, as here, the opinions of multiple medical consultants and providers validate the

score as well as the alleged functional limitations.  *Id.*

For example, agency consultants Drs. Theresa Harris and Joseph Patalano found

that Cousino had "[m]oderate" restriction in activities of daily living and "[m]oderate"

difficulties in maintaining concentration, persistence, or pace[4]; and that Cousino's

perceptual reasoning IQ score was "on the cusp of extremely low and borderline and

suggested a nonverbal learning disorder."  (AR 82, 84, 94, 96.)  And examining

consultant Dr. Oxidine stated that "Cousino's daily activities appeared to be restricted

due to his reported difficulties with memory and concentration, his limited, isolating

interests, his difficulty with ADLs, and his problems following-through and focusing on

---

[4]  The ALJ questioned the finding of agency consultants Drs. Harris and Patalano that Cousino was moderately limited in maintaining concentration, persistence, and pace, on the grounds that Cousino "spends his days watching television, eating 'junk food,' and using a computer," activities which "require sufficient concentration, persistence[,] and pace."  (AR 19.)  But it is unclear how engaging in these activities, in and of itself and without further information about the frequency and level of engagement, requires more than a slight amount of concentration, persistence, and pace.  *See Hamlin v. Barnhart*, 365 F.3d 1208, 1221 (10th Cir. 2004).  The Function Report prepared by Cousino's stepmother indicates that Cousino's level of engagement in these activities was minimal, informing that he uses the computer (including Facebook and the Internet) only "when he can," and that he "falls asleep all the time in front of the TV . . . [because ] he can't focus on anything."  (AR 215.)

tasks." (AR 310.) Dr. Oxidine opined that Cousino was "not capable of managing funds on his own behalf." (AR 311.) Examining consultant Dr. Skolnik similarly found that Cousino had a "significant learning disorder," and "one might question his capacity to handle his own finances." (AR 316.) Dr. Skolnik referred to the Stern Center testing as a "very comprehensive assessment," and diagnosed Cousino with "Learning disorder not otherwise specified." (AR 317.) Finally, treating Nurse Lewis stated that Cousino "clearly lacks an ability to remain focused on job completion or detail and has lost jobs due to this problem." (AR 336.) She noted, "[i]t is very surprising that [Cousino] has been denied disability." (AR 337.)

Furthermore, the record demonstrates that Cousino's primary mental problems were not with oral communication—the only area the ALJ could have effectively observed at the administrative hearing—but rather, with processing information, resulting in difficulty reading, writing, and "work[ing] at levels commensurate with his cognitive abilities or those of the general population" (AR 300). As the ALJ noted in his decision, Cousino himself told Dr. Skolnik that he has "'always been better verbally than non-verbally.'" (AR 25 (quoting AR 314-15).)

Paradoxically, although the ALJ placed a great deal of emphasis on his own opinion of Cousino based on his brief observation of him at the administrative hearing, the ALJ rejected the statements and opinions of those individuals (Cousino's father, stepmother, and supervisor at Hannaford's) who lived and worked with Cousino for years, observing him on an almost daily basis. Cousino's stepmother, Susan Levine, stated that Cousino: "cannot do normal, everyday hygiene without direct supervision &

15

help"; "bathes only after many reminders & then he doesn't bathe thoroughly"; "uses the toilet, [but] never remembers to zip his fly & doesn't wipe himself well"; and "cannot take care of himself without constant help." (AR 211-12.) Cousino's father, Charles Cousino, stated that Cousino "cannot perform activities of daily living such as showering, changing clothes, brushing his teeth, etc., without supervision and guidance" (AR 286), and "leaves lights on and water running" (AR 122). Cousino's former supervisor at Hannaford's, Amanda Clark, stated that Cousino had "some difficulty" cleaning the seafood department, and that his "personal hygiene" needed to be addressed. (AR 253.)

The ALJ did not properly analyze the statements of these individuals. He gave "little weight" to the statements of Charles Cousino and Susan Levine, finding that their "accuracy" was "questionable," because they "lack[ed] any education, experience or expertise at making exacting medical observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms." (AR 29.) He also gave "little weight" to the statements of Amanda Clark, partially on similar grounds, finding that she "is not considered an acceptable medical source under the regulations." (AR 30.) But Cousino's father, stepmother, and former supervisor were not medical sources at all, and thus the ALJ should not have evaluated them under this standard. Rather, the ALJ should have considered that the their statements may have been based on their "special knowledge" and may have provided "insight into the severity of [Cousino's] impairment[s] and how [they] affect[ed] [Cousino's] ability to function." SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (citing 20 C.F.R. § 404.1513(d)(4)).

16

Social Security Ruling 06-03p instructs that, in considering evidence from "non-medical sources" such as parents and employers, ALJs should "consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *Id.* at *6. The ALJ does not appear to have considered that the statements of Cousino's father, stepmother, and former supervisor were valuable because they had extensive and longstanding relationships with Cousino.  Rather, at least with respect to Charles Cousino and Susan Levine, the ALJ appears to have given *less weight* to their opinions because of their close relationship with Cousino, stating as follows: "[B]y virtue of their relationship to [Cousino], they cannot be considered disinterested third parties whose testimony would not tend to be colored by affection for [Cousino] and a natural tendency to agree with the symptoms and limitations that he alleges." (AR 29.)  Accordingly, the ALJ failed to properly consider the statements of Cousino's father, stepmother, and former supervisor.  The error was not harmless, given that their statements—particularly those regarding Cousino's poor hygiene—are consistent not only with each other, but also with the medical evaluations and treatment notes of Dr. Mulholland, Dr. Oxidine, Dr. Skolnik, Nurse Lewis, and others.  (*Compare* AR 122, 211-12, 253, and 286 (described *supra*) *with* AR 257 (Dr. Mulholland recording that Cousino's father "has to tell [Cousino] to wash his clothes"); AR 310-11 (Dr. Oxidine noting Cousino's reported difficulties with activities of daily living, and opining that Cousino was "not capable of managing funds on his own behalf"); AR 313 (Dr. Skolnik stating that Cousino "presented as a somewhat disheveled and poorly groomed man," and that "one might question his capacity to

handle his own finances"); AR 315 (Dr. Skolnik finding that Cousino "simply does not have a sense of the importance or desirability of personal hygiene"); AR 336, 393 (Nurse Lewis noting that Cousino's "teeth need brushing" and that Cousino's personal care "remains very poor, even to the point of others needing to tell him to bathe, shave, [and] pull up his pants zipper"); and AR 410 (consulting psychologist Hal Schmitter observing that Cousino appeared "disheveled").)

For these reasons, the Court finds that the ALJ did not provide sufficient reasons to reject Cousino's perceptual reasoning score of 69.  The ALJ's error is not harmless, given that there is substantial evidence in the record to support findings that Cousino had "deficits in adaptive functioning"[5] which were "initially manifested" before age 22, and an "impairment imposing an additional and significant work-related limitation of function,"[6] as required to meet Listing 12.05C.  (*See, e.g.*, AR 48-49 (Cousino's testimony stating that he was in special education classes in high school and has never had a driver's license); AR 288 (Stern Center report recording that Cousino was evaluated in early elementary school and found eligible for special education, subsequently receiving assistance inside and outside the classroom); AR 122, 286

---

[5]  The Second Circuit recently explained that "adaptive functioning" refers to an individual's "[]ability to cope with the challenges of ordinary everyday life," and that "if one is able to satisfactorily navigate activities such as liv[ing] on [one's] own, tak[ing] care of . . . children . . . without help . . ., pay[ing] bills, and avoid[ing] eviction, one does not suffer from deficits in adaptive functioning." *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (quotation marks and citations omitted).  As discussed above, the record demonstrates that Cousino does not live on his own or care for anyone else, and has great difficulty preparing his own meals, keeping himself well-groomed, and managing his own finances.

[6]  Several appellate courts have held that a finding of a severe impairment, as the ALJ found here, establishes the second prong of Listing 12.05C, which requires a physical or other mental impairment imposing an additional and significant work-related limitation of function.  *Markle v. Barnhart*, 324 F.3d at 188 (citing *Luckey v. U.S. Dept. of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989); *Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987)).

(Cousino's father's letters stating that Cousino is unable to do household chores, leaves
the lights on and the water running, and cannot perform activities of daily living
including showering and changing clothes without supervision and guidance); AR 194-99
(Function Report prepared by Cousino indicating that he needs reminders to care for his
personal needs and grooming, and is unable to handle his own finances); AR 211-15
(Function Report prepared by Cousino's stepmother stating that Cousino cannot maintain
everyday hygiene without direct supervision and help, and is unable to do any household
chores satisfactorily); AR 309 (Dr. Oxidine noting that Cousino's stepmother reported
that Cousino needs supervision, continual reminding about his hygiene, and help
handling money); AR 253 (job questionnaire prepared by Hannaford's supervisor stating
that Cousino's hygiene needed to be addressed); AR 255 (termination report prepared by
Hannaford's supervisor documenting Cousino's repeated failure to properly clean his
department); AR 335 (Nurse Lewis's treatment notes indicating that Cousino "needs
constant reminders to clean himself [and] cook for himself," and cannot follow even
simple directions such as "'go upstairs, brush your teeth, make your bed'"); AR 338
(Stern Center report stating that treating physician Dr. Mulholland "advised" Cousino "to
apply for disability benefits"); AR 373, 382 (Nurse Lewis opining that Cousino's
"[p]ersonal care and activities of daily living [are] very limited" and that Cousino has
"extreme" difficulties in maintaining concentration, persistence, or pace); AR 411-12
(psychologist Hal Schmitter cataloging Cousino's failed employment history and noting
"chronic problems of cleanliness, hygiene").  This evidence, taken as a whole, portrays
an approximately forty-year-old man who has significant difficulty caring for his own

personal needs and grooming, let alone maintaining a full-time job on a permanent basis.[7]
The ALJ should have given more consideration to this evidence and provided better
reasons for rejecting it, before determining that Cousino could not meet or medically
equal Listing 12.05C.  *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (ALJs may
discount relevant evidence, but must give good reasons for doing so); *Ferraris v.
Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("the crucial factors in any determination must
be set forth with sufficient specificity to enable us to decide whether the determination is
supported by substantial evidence").

## Conclusion

The matter should be remanded for a reassessment at step three regarding whether
Cousino's combined impairments meet or medically equal Listing 12.05C.  Cousino
requests that, instead of remanding for further proceedings, the Court should reverse and
remand solely for a calculation of benefits.  But in cases where there are gaps in the
administrative record or the ALJ has applied an improper legal standard, it is more
appropriate to remand for further proceedings and a new decision.  *Rosa v. Callahan*, 168
F.3d 72, 82-83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  Here,
after applying the proper legal standard, an ALJ may still find that Cousino was not
disabled during the relevant period.  In that event, an award of benefits would not be

---

[7] Although the ALJ repeatedly stated in his decision that Cousino had an extensive work history
which was "not indicative of a mentally unstable person incapable of holding a job" (AR 27), the record
demonstrates that this work history was largely unsuccessful (AR 51-56, 253-55, 411).  Cousino was fired
from most jobs for either performance or hygiene problems, and it appears that Cousino's most
longstanding employer, Hannaford's, may have tolerated these issues longer than most other employers
would.  (*Id.*)  Moreover, the record reflects that the principal reason Cousino saw Dr. Mulholland in July
2010 was because he had been "unable to maintain steady relationships or employment."  (AR 256.)

warranted.  Thus, Cousino's request that the matter be reversed and remanded solely for a calculation of benefits is DENIED.

For these reasons, the Court GRANTS Cousino's motion (Doc. 9), in part, DENIES the Commissioner's motion (Doc. 12), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 10th day of September, 2013.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge